Gay Woodhouse, 5-1580
Christopher M. Brennan, #7-5529
WOODHOUSE RODEN AMES & BRENNAN, LLC
1912 Capitol Ave., Ste 500
Cheyenne, WY 82001
307-432-9399
Email: gay@wrablaw.com
*Attorney for Defendant Sadiq Quasim*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING (CHEYENNE)

| | |
|---|---|
| **NATHAN CHRISTIAN,** <br><br>                    Plaintiff, <br> v. <br><br> **LOYAKK, INC.,** <br> **LOYAKK LTD.,** <br> **SALIM ALI,** *and* <br> **SADIQ QUASIM** <br><br>                    Defendants. | Case No. 1:22-cv-00215 <br><br> **REPLY MEMORANDUM OF LAW** <br> **AND POINTS OF LAW** <br> *by* **DEFENDANT SADIQ QUASIM** <br> *in further support of* <br> **QUASIM'S MOTION TO DISMISS** |

A.   **Introduction**

This Reply Memorandum narrowly responds to the issues raised by their Plaintiff in their Opposition to the Motion to Dismiss (Docket Entries 26, 27)(December 14 and 15, 2022).

The Plaintiff argues that Defendant Quasim engaged in activity directed at Wyoming in his role as CEO (Memo in Opp. at pp. 5-8, Argument § I).   We show that an individual is not subject to personal jurisdiction for actions taken as an employee of a corporation.

Plaintiff argues (Memo in Opp. at pp. 11-15, Argument § III) that Quasim is liable as an alter ego of Loyakk, Inc., but the alleged activity was done as an agent of Loyakk Ltd.

Plaintiff argues that three months is not a "reasonable time" under Diamond Fortress Techs, Inc., Memo in Opp. at pp. 8-10, Argument § II(A)).  But whether we use three months, thirteen months or thirty months, the amount in controversy does not rise to $75,000.00.  Plaintiff claims the float percentage may entitle Plaintiff to $84,500.00 (Memo in Opp., pp. 9-10); DE 27.

In fact, the public record shows that the Initial Coin Offering was a complete failure and 0.5% percent of the float is $243.15 (*See* Quasim Affidavit).  Therefore the amount in dispute is less than $75,000.00.

For these reasons and those explained in the original moving papers (Docket Entry 17), Defendant Quasim respectfully submits the Complaint should be dismissed and with prejudice.

B.   **Argument**

    i.   **Defendant Quasim did not personally engage in intentional action expressly aimed at Wyoming**

The Plaintiff cites the Complaint at ¶¶ 12-17, 21-24 and 32 to show  that Defendant Quasim directed activities at Wyoming, Memo in Opp. at p. 4.  Plaintiff cites cases which found minimum contacts based on single letters, phone calls and other limited activity, Memo in Opp. at p. 6.

The Plaintiff separately argues that these actions directed at Wyoming were done as an alter ego of Loyakk UK which allegedly signed a Wyoming jurisdiction clause, *Id.*

As shown below, the evidence identified by the Plaintiff in support of their argument does not stand up scrutiny. We review the Plaintiff's punchlist provided at pages 13 and 14 of their Memo in Opposition and explain how none of those allegations support piercing the corporate veil; or provide for personal liability of Mr. Quasim as an alter ego of Loyakk Ltd.

Punchlist items 1 and 2 allege that Loyakk Inc., and Loyakk Ltd., were related companies. Punchlist items 3 and 4 cite the claim that Defendants Ali and Quasim held various positions at Loyakk Inc., and Loyakk Ltd. Punchlist items 5 and 9 suggest that the Loyakk entities had blended into each other – a fact that is neither here nor there with respect to Quasim being subject to personal jurisdiction, or imposing personal liability on Quasim personally.

The takeaway from these 5 items is that Loyakk Inc., and Loyakk Ltd., were related companies. Whether true or not, the existence of separate legal entities does nothing to suggest that Quasim personally directed his activities at Wyoming or that he should be personally liable for alleged torts by other parties.

Punchlist item 6 through 8 cite the Complaint at ¶¶ 14-16, 21 and 23 to describe the following basis to pierce the corporate veil and find that Quasim was an alter ego of Loyakk Ltd.:

- Ali, the CEO of Loyakk U.S., is the individual who initially solicited Plaintiff's services, engaged in the negotiation of the Advisor Contract, and wanted to 'move [the parties'] partnership.' ECF 1 ¶¶ 14-16;

- In the context of the Advisor Contract, Plaintiff worked with Loyakk U.S. through its co-Defendants in seeking additional advisors/ consultants and improving Loyakk's overall brand. ECF 1 ¶ 21;

- When concerns were raised about Plaintiff's performance under the contract, Plaintiff spoke with Ali and Quasim about how to improve the relationship ECF 1 ¶ 23.

Memorandum of Law in Opposition at p. 14.

On its face, these facts support the tautology that Corporations act through its officers, directors, agents and employees.  The fact that a Party engaged in negotiations with a Company through individuals, does nothing to establish that those individuals are personally liable or are subject to personal jurisdiction where those negotiations took place.  And the underlying allegations in the Complaint (Complaint at ¶¶ 14-16, 21, and 23) all describe the pedestrian observation that Loyakk Ltd., engaged in negotiations with Plaintiff through its officers.

And in fact, the Complaint makes pellucid that all actions taken by Defendant Quasim were done as an agent of the relevant corporations.  These include the following allegations:

15. On or about April 7, 2018, [Plaintiff] was contacted by . . . Quasim . . . regarding the possibility of Christian being engaged for advisement services to Loyakk Ltd. in promoting the ICO *on behalf of Loyakk, [Inc.]*

26. In early July 2018, [Plaintiff] also negotiated, facilitated, and/or offered to facilitate video interviews with upcoming social media influencers in the crypto industry *on behalf of Loyakk* to further promote Loyakk's tokens.

32. On December 7, 2018, at a meeting more than a month after the contract had expired . . . *Quasim, on behalf of Loyakk [Ltd.]*, indicated to Plaintiff that there was an issue with upholding Loyakk [Ltd.]'s end of the deal to pay [Plaintiff] for services rendered.  Quasim . . . *admitted to Loyakk [Ltd.] owing Plaintiff* under the Advisor Contract . . . .   That conversation ended with . . . *Quasim, on behalf of Loyakk U.K.,* promising to pay [Plaintiff in the near future].

48. Quasim ha[d] active [an] role[] in negotiating and engaging [Plaintiff]'s service on contract *on behalf of Loyakk [Ltd.]*"

52. Quasim actively participated in either negotiations of, or thereafter execution of the Advisor Contract *on behalf of Loyakk [Ltd.]*"

"69. [Plaintiff] completed performance of his portion of the Advisor Contract as agreed to by Ali and Quasim*, on behalf of Loyakk [Ltd.]*"

Emphasis added in all cases.  At no time is there any allegation that there was any personal business relationship with Quasim – all activity was "on behalf of Ltd."

As it relates to personal jurisdiction and alter ego and/or piercing the corporate veil liability – this distinction between personal actions and actions taken "on behalf of [a company]" has long been recognized in the Tenth Circuit.  *See* for example, Wilshire Oil Co. v. Riffe, 409 F.2d 1277 (10th Cir. 1969), an analysis conducted under International Shoe Co. v. Washington, 326 U.S. 310 (1945) and Kansas law, but the principle – distinguishing between actions taken personally and actions taken in the name of a corporation still holds.  In Wilshire, the Defendant "in his capacity as an employee" attended meetings in Kansas, submitted a signed bid, signed bid forms, loaned money to a party.

The Tenth Circuit held:

> "The foregoing activities were, for the most part, conducted by [Defendants] in their capacity **as agents and employees** of [a company].  This led the district court to conclude that these agents, in performing these acts for their corporate principal, did not thereby render themselves personally amenable to service of process under the Kansas statute, i.e., they were not individually transacting business in Kansas in the sense specified in the statute.  The court found with respect to the other alleged minimum contacts, that the contacts either did not take place within the forum, or if they did, they did not give rise to the cause of action asserted. We agree with this conclusion of the district court."

Wilshire, *Id.* at 1280-81 (emphasis added).

In Wilshire Tenth Circuit confirmed that since the relevant business activities "were not [Defendant's] personal acts and seemingly cannot constitute the transaction of business by [the Defendant] as an individual."  Wilshire, *Id.* at 1281.

For these reasons we respectfully submit that all allegations about Defendant Quasim activities were about what he allegedly did *on behalf of Loyakk U.K.* and not in any personal capacity.

For this reason, there is no personal jurisdiction over Defendant Quasim and the Complaint must be dismissed as against him.

### ii. The Complaint does not sufficiently allege any basis to pierce the Corporate Veil or impose alter ego liability

And as it relates to alter ego liability (or consent to personal jurisdiction in Wyoming), the Complaint contains no non-conclusory allegations that Quasim can be held personally liable for the actions of another corporation; or can be subject to personal jurisdiction in Wyoming for activities aimed at this State by another party.

The factual basis to pierce the corporate veil (and impose alter ego personal jurisdiction) on Defendant Ali is summarized in pages 13 -14 of the Complaint.

As shown, all allegations are about actions taken by Defendant Quasim in his role as a corporate officer. The Complaint and the Plaintiff's argument does not even attempt to show how the Sampson v. Hunt, 665 P.2d 743 (Kan. 1983) – cited by the Plaintiff at p. 11 of their Memorandum in Opposition – factors have been met.

There are no allegations of "undercapitalization" and the Complaint itself alleges that it is at least a two-man corporation, Sampson Factor (1). The alleged failures to observe corporate formalities are contradicted by the allegations about the winding up of the Corporation in the UK, and the lapsing of the Corporation in California when the project failed, Sampson Factor (2). The Complaint never alleges any nonpayment of dividends and siphoning of corporate funds, Sample Factors (3) and (4).

The Complaint itself alleges that there were a full gamut of officers and that there were corporate records, Sampson Factors (5) and (6). And as described above, all actions were done by Defendant Ali in the name of the Corporation, not personally, Sampson Factor (7).

The last factor – promoting injustice and fraud – is never alleged in the Complaint, Sampson Factor (8).  The sole argument is that if the claim were to proceed against Loyakk U.K., it would fail because that company has winded up.  While Defendant Ali may share Plaintiff's disappointment that the Vega Project failed – which recent news confirms is not uncommon in the high-stakes, high-risk cryptocurrency industry – that does not establish any basis to impose personal liability on the alleged former officers of that corporation.

For these reasons, Defendant Ali respectfully submits that the Complaint has failed to allege any basis to pierce the corporate veil or to impose person jurisdiction on Defendant Ali as an alter ego of Loyakk U.K.

### iii.   Whether the "reasonable time" is three months, thirteen months or thirty months, the alleged damages are less than $75,000.00

As an initial matter, the Plaintiff's inclusion of "reason attorney's fees" and "prejudgment as well as post-judgment interest" is expressly excluded by the language of 28 U.S.C. § 1332 ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, *exclusive of interests and costs . . .*").

Turning to the substance, the Plaintiff argues that "[w]hile three months was held to be a reasonable time in Diamond [Fortress Techs., Inc. v. EverID, Inc., 274 A.3d 287 (Sup.Ct. Delaware New Castle Apr. 14, 2022)(Wallace, J. Paul R.)], it has not been set as a bright-line rule." Memorandum in Opposition at p. 9.

Whether a "reasonable time" is three months, thirteen months or thirty months is academic. In any event the alleged damages are less than $75,000.00.  As shown at Exhibit A of the Affidavit in Further Support by Defendant Ali (Docket Entry 21)( December 8, 2022), the earliest time that

the value of Ether rose above $681.82 – the price at which the "amount in controversy" would be over $75,000.00 – was December 27, 2020, when the price of Ether hit $683.21. This was *years* after the initial Ether payment was allegedly due.

For these reasons the amount in controversy with respect to the Ether is undoubtedly less than $75,000.00 and the Complaint must be dismissed as against Defendant Ali.

    **iv.**    The actual amount raised in the ICO was about $48,630.33 and Plaintiff's alleged entitlement is at most $243.15

Like someone playing a game of three card monte, the Plaintiff recognizes that their Ether valuation theory does not establish the amount in controversy necessary to obtain subject matter jurisdiction in federal court, and the interest and fees cannot be calculated into the $75,000.00. As a final attempt to find the Queen of Hearts, the Plaintiff points to a triple hearsay blogpost on "cryptodaily.co.uk" by Adrian Barkley, Memo in Opp. at pp. 9-10. In the typical bombastic and unsourced style of cryptocurrency journalism in 2019, Mr. Barkley's blog post claimed "Loyakk sold a total of 48 million tokens" and "rais[ed] $16.9 million mostly from venture capital investment."

As shown in the Affidavit in Support by Defendant Quasim, the actual amount raised in the Loyakk ICO was forty-eight thousand six hundred and thirty United States dollars and thirty-three cents ($48,630.33). And in fact, 0.5% was without any value from day one because of the failure of the ICO and the lack of any cryptocurrency exchange willing to list the token. And even if the float is deemed to have been partially successful (in fact it did not even come close to covering the expenses of initiating the project and never developed any secondary market) then according to the Complaint, the Plaintiff would have been entitled to 0.5% - in other words $243.15.

For the avoidance of doubt, it is appropriate for this Court to consider the Quasim Affidavit in support and other material outside of the Complaint as evidence of the amount in controversy. "In a factual attack to subject matter jurisdiction, a party challenging jurisdiction under 'Rule 12(b)(1) may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends." Knezovich v. United States, Case No. 21-cv-180, 2022 U.S.Dist. LEXIS 87805 *5 (D.Wyo. April 14, 2022)(Johnson, District Judge Alan B.) *citing* Davis ex rel. Davis v. United States, 343 F.3d 1282, 1295 (10th Cir. 2003).

"[a] 'court may not presume the truthfulness of the complaint's factual allegations,'" Knezovich, *Id.* at *5 *citing* Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995); and " 'has wide discretion' and may look to affidavits and other documents and even hold a limited evidentiary hearing to resolve the jurisdiction question. . . . Looking to evidence outside the pleading would not automatically convert the motion to dismiss to a Rule 56 motion for summary judgment." Knezovoch, *Id.* at *5 *citing* Davis, F.3d at 1296.

To summarize: Plaintiff's sole evidence is a third hand report from a 2019 online blog, that the ICO raised millions of dollars. Consistent with the standards for consideration of Rule 12(b)(1) Motions to Dismiss for lack of subject matter jurisdiction, Defendant has introduced competent evidence that the actual amount raised was $48,630.33 (of which, at most the Plaintiff was entitled to float valued at $243.15). The Plaintiff bears the burden of proof to establish subject matter jurisdiction, Becker v. Angle, 165 F.2d 140 (10th Cir. 1947) and has failed to do so in this case. At the very least it is a disputed matter that should be resolved in a summary hearing rather than allow this case to proceed to Discovery given the lingering questions about subject matter jurisdiction.

    **v.**    **Other Considerations**

The Memorandum of Law in Opposition brushes up against a number of other issues. Defendant Quasim respectfully points to its Memorandum of Law in Support of the Motion to Dismiss which address them all.

### C. Conclusion

For the reasons described full above, we respectfully submit that this Court has no personal jurisdiction over Defendant Quasim; and no jurisdiction over this dispute. Even if this Honorable Court were to find jurisdiction over the dispute, the Complaint provides no factual basis to pierce the corporate veil and to impose personal liability on Defendant Quasim for alleged wrongdoing by Loyakk Ltd. And as shown in the Memorandum of Law in Support of the Motion to Dismiss and this Memorandum of law, there is no cause of action properly plead against Defendant Quasim, the Plaintiff failed to name a necessary party, and the claims are barred by the doctrine of laches.

For these reasons, Defendant Ali respectfully submits that the Complaint must be dismissed with prejudice and without leave to Amend because any such amendment would be futile.

Dated: **December 19, 2022**

Respectfully submitted,

*/s/ Baruch S. Gottesman*
Baruch S. Gottesman, Esq.
Law Office of Baruch S. Gottesman, Esq.
185-12 Union Turnpike
Fresh Meadows, NY 11366
(212) 401-6910
bg@gottesmanlegal.com
*Attorney for Defendant Sadiq Quasim*
*Admitted* Pro Hac Vice *11/30/2022 (Docket Entry 16)*