

**FILED**

*4:23 pm, 1/12/23*

**Margaret Botkins
Clerk of Court**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

———————————

NATHAN CHRISTIAN,

        Plaintiff,

vs.

LOYAKK, INC., LOYAKK LTD.,
SALIM ALI, and SADIQ QUASIM,

        Defendants.

Case No.  22-CV-215-F

---

## OPINION AND ORDER ON MOTIONS TO DISMISS

---

        This matter is before the Court on the motions of Defendants Salim Ali, Loyakk, Inc. (referred to as "Loyakk U.S."), and Sadiq Quasim (collectively, the "Movants") to dismiss the claims against them.  ECF 8, 9, 17.  Plaintiff Nathan Christian opposes the motions.  ECF 19, 20, 26.  The Movants have replied.  ECF 21, 22, 29, 32 (amended reply).  The Court allowed Plaintiff to sur-reply to one of Quasim's reply arguments.  ECF 33.  For the reasons that follow, the Court grants in part and denies in part the motions.

*I.    Fact Allegations*

        This case centers around a "Strategic Advisor/Consultancy Services Agreement" (the "Agreement") that Plaintiff entered into with Defendant Loyakk, Ltd. ("Loyakk U.K.")[1] as of April 14, 2018.  ECF 1-2 at 40 (Complaint, Ex. 5).  Plaintiff alleges that he

---

[1] Loyakk U.K. has not yet entered an appearance.

1

is an advisor in the blockchain technology sector and an entrepreneur in the cryptocurrency industry.  He is a United States citizen and lives in Laramie County, Wyoming.

A.      *Bitcoin, Blockchain, and Cryptocurrencies*

The Complaint uses the terms blockchain and cryptocurrency, and the Agreement refers to bitcoin — but none of the parties appear to define those terms.  The Court takes judicial notice that

> [w]hen using the capitalized term, one is referring to the Bitcoin software and the decentralized computer network (Bitcoin Network) of users running that software. The Bitcoin software and protocols (the source code) were first described in a white paper released in November 2008 by an author using the pen name Satoshi Nakamoto. … Nakamoto's innovation spawned from an online community of computer scientists who studied cryptography and the application of the technology toward the creation of an efficient and verifiable digital asset (or virtual currency) system.

Kaye Scholer, *An Introduction to Bitcoin and Blockchain Technology* at 4 (February 2016), available at  https://www.arnoldporter.com/-/media/files/perspectives/publications/2015/10/fintech-an-intro-to-bitcoin-and-blockchain-tech.pdf?la=en, last accessed January 12, 2023 (note omitted, hereafter referred to as the *Kaye Scholer Primer*).

> Unlike prior attempts to develop a digital asset, the technology proposed by Nakamoto did not rely on a centralized clearing house (a trusted third party) to verify money supply and transactions.  Instead, the Bitcoin community progressively built out a decentralized network of computers that exert a tremendous amount of computing power toward the singular purpose of validating and clearing transactions on the Bitcoin Network.

*Id.* at 4, 6 (note omitted).  "The distributed and decentralized network allows each individual user to verify the validity of individual transactions and the system, as a whole, through the cryptographic protocols and the transaction history of the Bitcoin Network, which is stored by each user on a distributed ledger known as the Blockchain."  *Id.* at 6.

The "Blockchain" represents the second great innovation from Nakamoto. As a distributed ledger, the Blockchain is stored locally on the computer hard drive of every user running a full version of the Bitcoin software. The ledger records the history of every transaction sent and confirmed on the Bitcoin Network, including information included as a part of those transactions.

*Id.* "Users running a special mining variant of the Bitcoin software expend great amounts of computing power in order to win the right to add another block to the Blockchain, which is accompanied by a reward of … bitcoins." *Id.*[2]

The underpinning of the Bitcoin Network payment system is … the little "b" bitcoin. The lowercase version of bitcoin references the core unit of value on the Bitcoin Network. A bitcoin can be subdivided to eight decimal places, with the smallest unit – a satoshi – having a value of 1/100,000,000th of a bitcoin. In sum, under the Bitcoin source code, a total of 21 million bitcoins will be created as mining rewards, distributed as compensation to miners in the process that adds blocks to the Blockchain.

*Kaye Scholer Primer* at 6-7.[3] The abbreviation for bitcoin is BTC. https://en.wikipedia.org/wiki/Bitcoin, accessed January 12, 2023.

Bitcoin has developed beyond its initial use to "altcoins" and other programming platforms that add other features and capabilities. *Id.* at 8-9. Pertinent to this case is one in particular, Ethereum. The Ethereum platform is a so-called Bitcoin 2.0 or Blockchain 2.0 program "which seeks to create a Turing-complete programming framework supported by an independent altcoin platform." *Id.* at 9. The native cryptocurrency for the Ethereum

---

[2] The number of bitcoins awarded to miners reduces over time as the number of blocks grows. *Id.* n.9.

[3] As of the date of Kaye Scholer's primer (February 2016), "[a]pproximately 72 percent (15.2 million of 21 million) of all bitcoins" had been mined. They estimated that "[b]y 2026, approximately 90 percent of all bitcoins will have been mined." *Id.* at 7.

platform is Ether, abbreviated as ETH.   https://en.wikipedia.org/wiki/Ethereum, last accessed January 12, 2023.[4]

>    B.    *Plaintiff's Consulting Agreement*

Under the Agreement, Loyakk U.K. was to pay Plaintiff for his services as follows:

The Company [Loyakk U.K.] shall pay to Consultant [Plaintiff] the sum of:

(a) 15 ETH paid within 3 (three) business days after end of Company's pre-ICO [(hereafter referred to as the *"Pre-ICO Ether"*)]

(b) 100 ETH, to be paid within 3 (three) business days after end of Company's ICO, [(hereafter, the *"Post-ICO Ether"*)] and

(c) 0.5% of total tokens (unrestricted) of the Company to Consultant upon Initial Coin Offering Date Completion [(hereafter, the *"Post-ICO Percentage"*)].

Other than payments under section (c) of this paragraph, all payments by Company to Consultant shall be made in BTC, ETH or fiat currency.  Company acknowledges and agrees that Consultant expressly retains the right to refuse acceptance of any payment in a form other than cash.

ECF 1-2 at 47 (Ex. B of the Agreement).  Plaintiff uses the terms "tokens" and "coins" interchangeably.

Plaintiff alleges that Loyakk U.K.'s pre-ICO sale began June 7, 2018 and ended on June 14, 2018.  Complaint ¶ 20.  The ICO began on June 15, 2018 and ended on October 31, 2018.  *Id.* ¶¶ 22, 29.  Plaintiff alleges he performed all of his obligations under the Agreement, and the last payment was due on November 3, 2018.  *Id.* ¶ 30.  He further alleges that he has not received any of the agreed-upon compensation.

---

[4] Ethereum is second in market size to bitcoin.  https://en.wikipedia.org/wiki/Ethereum*; Kaye Scholer Primer* at 7, n.15.

The Agreement has a forum-selection clause that requires "any legal action … arising out of or concerning this Agreement or any agreements or transactions contemplated hereby, including tort claims" to be brought in "the Courts of the State of Wyoming." *Id.* at 43. The Parties to the Agreement (Plaintiff and Loyakk U.K.) "expressly submit to the personal jurisdiction and the venue of those courts." *Id.* They also agreed that Wyoming law governs. *Id.*

### C. *The Defendants: Quasim, Loyakk U.K., Loyakk U.S., and Ali*

Defendant Sadiq Quasim signed the Agreement on behalf of Loyakk U.K. ECF 1-2 at 45 (Complaint, Ex. 5). Quasim resides in the U.K. and had his principal place of business in London. He was the chief executive officer for Loyakk U.K. Loyakk U.K. was a "foreign corporation based primarily in the United Kingdom that operated in the cryptocurrency sector and the European affiliate of Loyakk U.S." It had its principal place of business in London.

At various times, Quasim was also the chief executive officer, co-founder, director and advisor for Loyakk U.S. Complaint ¶ 6. Loyakk U.S. is a California corporation with its principal place of business in Sunnyvale, California. "Loyakk U.S. has been suspended by the California Franchise Tax Board since July 1, 2021, due to failure to meet its tax requirements." *Id*. ¶ 2.

> On information and belief, Loyakk U.S. purports to have developed a platform through which business enterprises could track user data on the blockchain improving transparency and compliance with General Data Protection Regulation ("GDPR"). [n.1] The propriet[ar]y software that Loyakk U.S. developed was called the Vega Enterprise Relationship Platform ("Vega Platform").

Complaint ¶ 2.  Thus, Plaintiff alleges that Loyakk *U.S.* developed the Vega Platform.

Loyakk *U.K.* issued a cryptocurrency for that platform in an Initial Coin Offering, "ICO."[5]

"[An ICO] is the cryptocurrency industry's equivalent of an initial public offering,

or 'IPO.'" *Id.* ¶ 3, n.2 (citing Jake Frankenfield, "Initial Coin Offering," Investopedia (July

7, 2022) https://www.investopedia.com/terms /i/initial-coin-offering-ico.asp).  Thus, as the

Complaint later alleges, the purpose of issuing the cryptocurrency was to "gain venture

capital."  Complaint ¶ 4.  In the Agreement's Post-ICO Percentage provision, "[a] portion

of these tokens were promised as payment to Plaintiff for his services." *Id.* ¶ 3.

Defendant Salim Ali is the chief executive officer and chief marketing officer of

Loyakk U.S.  He maintained his principal place of business in California.  "Ali further

maintained a managing and/or principal role at Loyakk U.K.  … Ali was, at various times

… Chief Executive Officer, co-founder, director, and advisor of Loyakk U.K." *Id.* ¶ 5.

D.      *Alter Ego Allegations*

Plaintiff alleges that Loyakk U.K. and Loyakk U.S. are alter egos:

> Loyakk U.S. and Loyakk U.K. (collectively Loyakk) were, at all times relevant to
> these proceedings, alter egos of one another in that they were related to each [other]
> by shareholdings, were under common ownership, confederated in their business
> affairs, or were otherwise controlled by Sadiq Quasim and Salim Ali.

Complaint ¶ 4.  Plaintiff also points to Loyakk U.K. and Loyakk U.S. using for both

companies the same brand, logo, white paper, marketing materials, addresses and website.

---

[5] The Complaint does not allege the function or purpose of Loyakk's cryptocurrency on the Vega Platform, but it is clear Loyakk U.K. issued the cryptocurrency for Loyakk U.S.'s platform.

Plaintiff further alleges that Ali and Quasim functioned as "agents of each other and as varying roles as agents, officers, or directors of Loyakk in that they exercised significant control and domination over Loyakk's business affairs in both the United States and the United Kingdom." *Id.* ¶ 7. Loyakk's website lists both Ali and Quasim as CEO in various location including their "Team" section and news articles, and Plaintiff alleges that in public interviews, personal Twitter activity, and Loyakk's Twitter activity, Ali and Quasim refer to both Loyakk entities as one company. *Id.*

Plaintiff also alleges that Ali and Quasim were alter egos of the two Loyakk entities:

Ali and Quasim not only influenced, managed, and governed Loyakk, but given their significant control over Loyakk, the companies became merely alter egos of the two individuals and thus instrumentalities through which Ali and Quasim's wrongs were perpetrated against Christian.
Ali and Quasim supervised and managed the: 1) winding up of Loyakk U.K.; 2) diverting of any and all of Loyakk U.K.'s assets to Loyakk U.S., iStrategies Ltd, iStrategies Limited, and/or other individuals and entities including, but not limited to the $16.9 million raised during Loyakk's ICO; or 3) leaving of any remaining assets of Loyakk U.K.'s to transfer to the Crown.

Complaint ¶ 48 (paragraph break added). Plaintiff further alleges that Ali and Quasim knew Loyakk U.K. had an outstanding debt to Plaintiff and nonetheless "dissolved Loyakk U.K. and simultaneously failed to compensate Christian in accordance with the Advisor Contract [while] lulling him with promises to pay in the near future. *Id. See also Id.* ¶¶ 33-42.

Less than a week after Loyakk U.K. was dissolved, Quasim formed a "new" private liability company under the same name but with a new corporate registration number. *Id.* ¶¶ 43-44. Plaintiff further alleges this is only one of several instances of Quasim dissolving companies (or allowing them to be dissolved) only to register a "new" company with the

same or nearly the same name shortly thereafter.  He alleges Quasim has done so to avoid his companies' obligations to creditors, including Loyakk U.K.'s obligations to Plaintiff.

Meanwhile, a third company (or companies) under Quasim's control – iStrategies Ltd. and iStrategies Limited – allegedly received assets diverted from Loyakk U.K. Quasim formed these companies in the United Kingdom, and he was their chief executive officer, founder, and director.  Complaint ¶ 6.  Plaintiff alleges that in addition to Loyakk U.K., iStrategies Ltd. issued an ICO for the Vega Platform.  *Id.* ¶ 8.  Quasim formed iStrategies Limited four days before iStrategies Ltd. was dissolved, and Plaintiff alleges they are effectively the same company.  *Id.* ¶ 9.  iStrategies is not a party.

Based on these fact allegations, Plaintiff brings five claims against all Defendants: Count I for breach of contract or aiding and abetting thereof; Count II for breach of the implied covenant of good faith and fair dealing, or aiding and abetting thereof; Count III for unjust enrichment; Count IV for quantum meruit; and Count V for negligence.

III.   *Analysis*

The Movants raise issues of subject matter jurisdiction, personal jurisdiction and the merits of the claims.  "[J]urisdiction generally must precede merits in dispositional order." *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 577 (1999).  "While 'there is no unyielding jurisdictional hierarchy' requiring federal courts to sequence one jurisdictional issue before the other, 'in most instances subject-matter jurisdiction will involve no arduous inquiry' and 'both expedition and sensitivity to state courts' coequal stature should impel the federal court to dispose of that issue first.'"  *Gadlin v. Sybron Intern. Corp.,* 222 F.3d 797, 799 (10th Cir. 2000) (internal citation omitted, quoting *Ruhrgas,* 526 U.S. at 587-88), *overruled*

*in part on other grounds, Hertz v. Friend,* 559 U.S. 77, 92-93 (2010). The Court accordingly turns first to subject matter jurisdiction.

    *A.    Subject Matter Jurisdiction*

Federal district courts are courts of limited jurisdiction. They have subject matter jurisdiction only as provided in 28 U.S.C. § 1331 (federal law claims) and § 1332 (diversity of citizenship). Here, Plaintiff technically alleges only jurisdiction by the Agreement. Complaint ¶ 10. But litigants cannot confer subject matter jurisdiction. *See, e.g., Basso v. Utah Power & Light Co.,* 495 F.2d 906, 909 (10th Cir. 1974) ("jurisdiction cannot be conferred … by consent, inaction or stipulation"). The Complaint nonetheless alleges facts to support diversity jurisdiction, and Plaintiff's briefs make plain that this is what he relies upon.

In diversity, the Court has "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between … citizens of different States and in which citizens or subjects of a foreign state are additional parties." 28 U.S.C. § 1332(a)(3). There is no dispute that diversity of citizenship is met; the only issue is whether Plaintiff's claims meet the minimum amount in controversy.

    *1.    Standard of Review*

Federal Rule of Civil Procedure 12(b)(1) permits a motion to dismiss for lack of subject matter jurisdiction. "Rule 12(b)(1) motions generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is

based." *Ruiz v. McDonnell,* 299 F.3d 1173, 1180 (10th Cir. 2002). Movants bring the latter type of motion, challenging the facts underlying Plaintiff's allegation of the amount in controversy.

> When a party challenges the allegations supporting subject-matter jurisdiction, the court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts. In such instances, a court's reference to evidence outside the pleadings does not convert the motion [to dismiss] to a Rule 56 motion [for summary judgment].

*Davis ex rel. Davis v. United States,* 343 F.3d 1282, 1296 (10th Cir. 2003) (internal citation and quotation marks omitted).

Plaintiff bears the burden of establishing the jurisdictional minimum. *Woodmen of World Life Ins. Soc. v. Manganaro,* 342 F.3d 1213, 1216 (10th Cir. 2003). To do so, Plaintiff "must show that it does not appear to a legal certainty that [he] cannot recover the jurisdiction[al] amount." *Id.* This is because

> unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. *It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.* The [later] inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction.

*St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288–89 (1938) (emphasis added; footnotes omitted), *superseded by statute on other grounds. See also Dart Cherokee Basin Operating Co., LLC v. Owens,* 574 U.S. 81, 87 (2014) (quoting *St. Paul Mercury* and *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U.S. 274, 276 (1977)).

The standard is "very strict," and it is thus "difficult for a dismissal to be premised on the basis that the requisite jurisdictional amount is not satisfied." *Woodmen,* 342 F.3d at 1216 (citing 14B Wright, Miller & Cooper, Federal Practice & Procedure: Jurisdiction

3d § 3702, at 97-98 (1998)).  "There is a strong presumption favoring the amount alleged by the plaintiff."  *Id.* at 1216–17.

> A plaintiff's allegations in the complaint alone can be sufficient to make this showing.  Although allegations in the complaint need not be specific or technical in nature, *sufficient facts must be alleged to convince the district court that recoverable damages will bear a reasonable relation to the minimum jurisdictional floor.*

*Adams v. Reliance Stand. Life Ins. Co.,* 225 F.3d 1179, 1183 (10th Cir. 2000) (emphasis added; internal quotation marks omitted).  "Generally, dismissal under the legal certainty standard will be warranted only when a contract limits the possible recovery, when the law limits the amount recoverable, or when there is an obvious abuse of federal court jurisdiction."  *Woodmen*, 342 F.3d at 1217.

> But if, from the face of the pleadings, it is apparent to a legal certainty, that the plaintiff cannot recover the amount claimed, or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed.

*St. Paul Mercury,* 303 U.S. at 289.  "If the amount becomes an issue, as in the case at bar, the trial court must make a determination of the facts."  *Emland Builders, Inc. v. Shea,* 359 F.2d 927, 929 (10th Cir. 1966).  "[W]here the allegations as to the amount in controversy are challenged by the defendant in an appropriate manner, the plaintiff must support them by competent proof."  *KVOS, Inc. v. Associated Press,* 299 U.S. 269, 278 (1936) (footnote omitted).  When a plaintiff fails to meet their burden on this issue, the Court must dismiss without prejudice.  *See, e.g., Lacey v. Homeowners of Am. Ins. Co.,* 546 F. App'x 755, 758 (10th Cir. 2013) (affirming dismissal without prejudice); *State Farm Mut. Auto. Ins. Co. v.*

*Narvaez,* 149 F.3d 1269, 1271 (10th Cir. 1998) (reversing summary judgment for insurer where the policy limit in coverage case was below the jurisdictional minimum).

Meanwhile, the Court must convert a Rule 12(b)(1) motion to a Rule 12(b)(6) or Rule 56 motion (after notice) when jurisdictional issues are intertwined with the merits of the claims. "When deciding whether jurisdiction is intertwined with the merits of a particular dispute, the underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim." *Davis*, 343 F.3d at 1296 (internal citation and quotation marks omitted, affirming that conversion was not necessary in that case). However, motions that challenge "whether the plaintiff met the amount-in-controversy requirement … [are] sufficiently independent of the merits of the claim to warrant independent examination" without converting the motion. *Gulf Oil Corp. v. Copp Paving Co., Inc.,* 419 U.S. 186, 213, n.10 (1974).[6] Accordingly, for purposes of the amount in controversy, the Court considers all materials submitted with the briefs without converting the motion.

2.     *The Allegations and Contentions Regarding the Amount in Controversy*

Plaintiff alleges that while the exact sum of his compensatory damages "depends, in part, on the fluctuating price of Ether[7] and the float of Loyakk U.K.'s tokens, these

---

[6] The Tenth Circuit has held conversion to summary judgment was necessary where a district court considered materials outside the complaint because the amount in controversy issue – the amount of possible punitive damages – was intertwined with the merits. *Burrell v. Burrell,* 229 F.3d 1162 (Table), 2000 WL 1113702 (10th Cir. Aug. 7, 2000). But *Burrell* is not precedential, and the damages issue here does not involve the merits of Plaintiff's claims. *Burrell* also cites in support only *Wheeler v. Hurdman*, 825 F.2d 257 (10th Cir. 1987), a case that did not involve the amount in controversy.

[7] The Complaint refers to a website, https://www.coindesk.com/price/ethereum/, for the current price of Ether coins. Complaint at 10, n.5. However, the judiciary's firewall or browser filters make the website inaccessible to the Court.

damages total at least $198,700."  Complaint ¶¶ 56, 63.  *See also Id.* ¶¶ 67, 70 (Plaintiff is "yet to receive over $198,700 in promised compensation").

The Complaint alleges two prices for Ether: on November 3, 2018 (the date that the Post-ICO Ether payment was due), it was $204.29 per coin.  On August 31, 2022, it was approximately $1,554.90 per coin.  *Id.* ¶ 30, n.5.  Thus, the 100 Post-ICO Ether were worth $20,429 on the date of breach, and three and a half years later were worth $155,490.  For the 15 Pre-ICO Ether, Plaintiff does not allege the price on that breach date, which appears to be June 17, 2018.

As for the Post-ICO Percentage, the Complaint alleges that Loyakk U.K. "allegedly raised $16.9 million of venture capital" in the ICO.  *Id.* ¶ 32.  *See also Id.* ¶ 75 ("reportedly" raised).  In other instances, Plaintiff alleges this as the amount in fact for the ICO.  *Id.* ¶¶ 42, 48.  0.5% of $16.9 million is $84,500.  This would in itself meet the jurisdictional minimum, assuming Plaintiff alleges the $16.9 million ICO in good faith.  And overall, $84,500+$20,429 = $104,929.  This total is of course nowhere near the $198,700 that Plaintiff alleges, unless the price per Ether on June 17, 2018 (for the Pre-ICO Ether) was very high – $6,251.40 per coin would be needed to make up the $93,711 difference.

### 3.   *Analysis*

Neither the Complaint nor Plaintiff's response briefs explain how he arrived at $198,700 in compensatory damages.  Plaintiff points out that he also seeks consequential damages, but he neither alleges nor argues any amount for that category.  Complaint at 21 ¶ B.  Plaintiff also points to attorney fees, costs and interest.  But interest and costs are excluded by § 1332(a).  As for attorney fees, Plaintiff does not cite any support that these

can be included in the amount in controversy in this case.  He does not cite a provision in the Agreement or a statute (or other law) under which he would be entitled to them.  *See, e.g., Gerig v. Krause Publ'ns, Inc.,* 58 F. Supp. 2d 1261, 1264–65 (D. Kan. 1999).  In any case, Plaintiff does not estimate his potential attorney fees.  This leaves only Plaintiff's alleged compensatory damages to support the jurisdictional minimum.

For purposes of the Rule 12(b)(1) motion, the Court assumes that all of Plaintiff's claims have merit.  However, the Court finds it unnecessary to go beyond the contractual claim to conclude that Plaintiff meets his burden on the amount in controversy.

In Wyoming contract law, "[t]he non-breaching party is entitled to recover such an amount as would place him in the condition he would have been in if the other party had adequately performed the contract, less that which was saved by the non-breaching party."  Wyo. Civil Pattern Jury Instruction 15.20 (2021 Ed.).  *See also JBC of Wyo. Corp. v. Cheyenne,* 843 P.2d 1190, 1195 (Wyo. 1992) (one of the cases cited by the instruction).  Wyoming has adopted Section 347 of the Restatement (2d) of Contracts (1981), which provides a non-breaching party "*has a right to damages based on his expectation interest as measured by (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss he has avoided by not having to perform.*"  *Reposa v. Buhler*, 770 P.2d 235, 237-38 (Wyo. 1989) (emphasis added).

Thus, assuming the merits of his contract claim, Plaintiff is entitled to his expectation interest on each of the three portions of compensation: the 15 Pre-ICO Ether, 100 Post-ICO Ether, and the Post-ICO Percentage of 0.5% of the total Loyakk tokens

issued at the end of the ICO.

Movants present two issues: first, they argue that until December 27, 2020, the price of Ether was too low for Plaintiff's 115 Pre-ICO and Post-ICO Ether to exceed the jurisdictional minimum. They argue that December 2020 is not within a reasonable time period from the breaches. Second, Quasim argues the ICO was worth only $48,000 and change – making Plaintiff's Post-ICO Percentage worth only $243, not the $84,000 and change that it would be if Plaintiff were correct in alleging the ICO brought in $16.9 million.

As the value of the ICO appears potentially determinative on its own, the Court begins with that issue. In his response to Quasim's motion, Plaintiff argues the Post-ICO Percentage entitles him to 0.5% of the $16.9 million he alleges Loyakk U.K. received in the ICO. He cites a blog in support of this allegation:

> The Loyakk Vega enterprise relationship management platform has recently announced that it will burn 1/5 of its circulating token supply.
> This announcement comes on the back of Loyakk completing its token sale in November 2018 and *raising $16.9 million mostly from venture capital investment.*

Adrian Barkley, *Loyakk Announces Huge Token Burn,* April 30, 2019, https://cryptodaily.co.uk/2019/04/loyakk-announces-huge-token-burn, accessed December 20, 2022 (emphasis added, in relevant part). Plaintiff notes that 0.5% of $16.9 million is $84,500.

Plaintiff's theory rests upon at least two assumptions. First, Plaintiff assumes he has a right to the cash value of his Post-ICO Percentage. Second, he assumes he would have exercised that right at the time. Plaintiff did not brief either of these assumptions, but

if the Complaint supports the former, the Court can reasonably infer the latter from Plaintiff's briefing.

As noted above, the Agreement provides that Loyakk U.K. shall pay Plaintiff the sum of: (a) the Pre-ICO Ether, (b) the Post-ICO Ether, and (c) the Post-ICO Percentage, subject to the following:

> *Other than payments under section (c)* of this paragraph, all payments by Company to Consultant shall be made in BTC, ETH or fiat currency.  Company acknowledges and agrees that Consultant expressly retains the right to refuse acceptance of *any* payment in a form other than cash.

ECF 1-2 at 47 (emphasis added).  Thus, the Pre-ICO and Post-ICO Ether could be paid in ETH, BTC, or fiat currency, but that sentence expressly does not apply to the Post-ICO Percentage.

However, the very next sentence provides Plaintiff the right to require cash for "any payment."  Construing the Post-ICO Percentage section (c) with the two sentences that follow it, Plaintiff has a good faith basis to believe that while the Post-ICO Percentage was not payable in Bitcoin or Ether, it was payable in Loyakk tokens *or cash*, at Plaintiff's choice.  Because the Complaint supports Plaintiff's argument that he was entitled to cash value, the Court infers that he also would have exercised the right to cash value at the time, if Loyakk U.K. had timely paid him.[8]

---

[8] In a stricken motion (ECF 35), Quasim argues these provisions limit the Post-ICO Percentage to payment in Loyakk U.K.'s tokens.  The Court does not reach whether these provisions are ambiguous.  It suffices that Plaintiff has a good faith basis to believe the Agreement is either clear or any ambiguity should be read in his favor.  *See, e.g., Broderick v. Keller*, 29 F. App'x 518, 521 (10th Cir. 2002) (in resolving amount in controversy issue, district court did not resolve dispute on contract language regarding plaintiff's ability to convert commission to stock option).

But Quasim replies that the only evidence Plaintiff has of a $16.9 million ICO is a blog which is inadmissible as hearsay. Quasim points out that it is not a statement by the Defendants and provides no attribution for asserting the ICO raised $16.9 million. He is correct in this regard. Mr. Barkley's blog does not purport to be a statement on behalf of any Defendants, and it does not identify any sources for asserting Loyakk had announced the ICO brought in $16.9 million.

Quasim further replies that "[t]he Loyakk Initial Coin Offering in 2018 was a complete failure. According to my records, the amount raised was forty-eight thousand six hundred and thirty United States dollars and thirty-three cents $48,630.33. This can be verified by the blockchain which shows 92 ETH & 2 BTC total purchases all of which were ultimately deposited in Loyakk's wallets at: ETH - …9318 [and] BTC - …KAlr." ECF 29-1, Reply Affidavit of Sadiq Quasim dated December 19, 2022, ¶¶ 6-8. This affidavit included screenshots from "etherscan.io" (to which he refers as a public source, the "Bible of the Ether ledger") of the "wallets" to which Quasim refers, reflecting that the address ending in 9318 had a total of 92 transactions in ETH (ECF 29-1 at 3 ¶ 8 ECF 32-1 at 1) and the address ending in KA1r had four (not two as Quasim states in his affidavit) BTC transactions, the latter involving a total of 0.720 BTC. ECF 29-1 at 3 ¶ 8, ECF 32-3 at 1.[9]

---

[9] Mr. Quasim's original reply affidavit provided hyperlinks to a public website, etherscan.io, *etc.,* but the Court's firewall or browser filters made them inaccessible. The screenshots in the original reply affidavit were only legible in part. At the Court's request, Quasim refiled legible copies on December 22, 2022. ECF 32-1, 32-3. In that filing, he also amended his reply affidavit in details that will be discussed below.

Quasim also attached screenshots of the wallets' blockchain ledgers.  ECF 29-2, 29-3; 32-2, 32-4.  The first lines of these blockchain screenshots are (respectively):



Thus, the Ether blockchain screenshot reflects that the address ending in 9318 had total transactions of 126.84 ETH with a total "value in" of $43,344.59.  It appears the blockchain contains the same number of entries (92) as the etherscan.io screenshot showed for total Ether transactions at this address .  The time period for entries shown in the ledger screenshot is May 2018 to January 2019.

The screenshot of the BTC blockchain is consistent with the etherscan.io screenshot, that the address ending in KA1r had total transactions of 0.72 BTC with a total "value in" of $5,285.74 (between November 2017 and February 2018).  ECF 29-2, 29-3.  Adding the sums in the ledgers' first lines results in the amount Quasim states in his reply affidavits, $48,630.33.  Of that amount, 0.5% (Plaintiff's share) would be $243.15.

But none of these screenshots purport to identify the entity or individual associated with the addresses ending in 9318 and KA1r.  Nor do any of Quasim's screenshots state whether these transactions were for purchases of Loyakk's token.  The Court takes judicial notice that

> [u]sers on the Bitcoin Network are identified by the digital addresses (i.e., hashes of their public keys) that they control, and such digital addresses serve as their pseudonyms on the Blockchain. The identity of users on the Blockchain can often be determined through a combination of either voluntary identification of users with

their digital addresses (e.g., through identity verification with Bitcoin exchanges or custodians), accidental identification by users or by statistical analysis.

*Kaye Scholer Primer* at 6.  The same is true of Ethereum, as the screenshots from the Ether ledger do not purport to identify the user by anything other than the digital address.

In his December 19, 2022 affidavit, Quasim voluntarily identifies that these are the wallets of Loyakk (U.K. or U.S., he does not specify), but he does not explain why or how the blockchain verifies this assertion.  Nor does he state how the blockchain verifies that these are the only wallets for Loyakk, or that they are the only wallets used for selling Loyakk's tokens (as opposed to addresses owned by other entities or individuals, such as Quasim or Ali).  Nor does he state that these transactions regard purchases of Loyakk's token, in order to verify his further assertion that the ICO raised only $48,630.33.  He states only that the blockchain shows the "total purchases all of which were ultimately deposited in Loyakk's wallets."

Quasim's amended reply affidavit of December 22, 2022 states that the screenshots "show[] all transfers to Loyakk."  ECF 32 ¶¶ 10, 13.[10]  However, again none of the attachments to the amended reply affidavit identify the entity or individual associated with these wallets, whether these transactions were for purchases of Loyakk's tokens, nor whether these wallets are a complete accounting of all funds Loyakk (U.K. or U.S.) received for its tokens.

---

[10] Quasim notes the definition of EtherScan from https: //en.bitcoinwiki.org/wiki/EtherScan, which is in relevant part: "a service on which any user can view Ethereum network statistics. The main task of the platform is to display information about the latest blocks and transactions of the network."

As this new factual argument regarding the value of the ICO is raised only in Quasim's reply, the Court permitted Plaintiff to sur-reply on this issue.[11]  In his sur-reply, Plaintiff buttresses his earlier argument that Movants publicly represented online multiple times that Loyakk U.K.'s ICO drew in several million dollars.  ECF 33.  He attaches in particular several archived versions of Loyakk webpages – retrieved through the Wayback Machine[12] – that substantiate Plaintiff's claim that Loyakk (whether U.K. or U.S.) made such representations.  Plaintiff argues Quasim is backing away from those representations to avoid this lawsuit.   Plaintiff asserts that "[a]mong other things, tax returns, bank statements and other financial information of Defendants will likely illuminate how differing representations were selectively leveraged to their benefit, just in the manner as is being done here." ECF 33 at 3.

As the Court understands it – from taking judicial notice above – blockchain is a secured, public ledger whose entries cannot later be modified.  Plaintiff's sur-reply does not dispute that the screenshots of the Ether and Bitcoin wallets are accurate, as far as they go.  He in fact does not address the wallets at all.  Plaintiff's argument, however, that

---

[11] After receiving Quasim's original reply, Plaintiff filed a request for judicial notice of three smartphone screenshots of messages in the "Telegram" app.  ECF 30-1.  The messages contain posts purporting to be made by three individuals ("Brad_PS," "Anthonius," and "Bennett Holiday") on behalf of Loyakk, on November 24, 2018, December 16, 2018, and March 4, 2019, stating that the Loyakk ICO raised $16.9 or $16.7 million.  ECF 30-1.  Because the exhibit is not appropriate for judicial notice, the Court denied the request and permitted Plaintiff to instead sur-reply.  ECF 31. It appears that he did not rely on these screenshots in his sur-reply.

[12] According to Plaintiff, the Wayback Machine is "an internet archive library of internet sites and other cultural artifacts in digital form."  ECF 33 at 2.  The Tenth Circuit has not decided whether courts can take judicial notice of webpages from the Wayback Machine. *United States v. Wirichaga-Landavazo,* 21-4070, 2022 WL 500651, at *2 n.2 (10th Cir. Feb. 18, 2022).  But again, the Court considers these materials only for the Rule 12(b)(1) factual attacks on the amount in controversy, and therefore does not need to convert the motion to summary judgment.

Loyakk's traditional financial and tax documents will show they "selectively leveraged" various representations of the ICO's value to suit their varying purposes does challenge that the wallets and Quasim's affidavits are a complete and accurate accounting of Loyakk U.K.'s ICO or its total "float" of tokens.

The Court finds that Quasim's affidavits and exhibits do not connect the dots as would be needed to challenge the minimum amount in controversy. The only thing that ties the wallets to Loyakk (U.K. or U.S.) and purchases of its tokens is Quasim's say so. The only thing that shows these wallets are the sole accounts in which Loyakk received or transferred funds from selling its tokens is again, Quasim's say so. He does not explain why his affidavit said there were two BTC transactions, while the screenshots show four. Meanwhile, Plaintiff's sur-reply and exhibits challenge the credibility of Quasim's present assertions regarding the ICO. The Court notes that after Plaintiff filed his sur-reply attaching Loyakk's former representations of a multi-million dollar ICO, Quasim wished to back away from his reply on this issue and argue instead that the value of the ICO is irrelevant. ECF 35 (stricken motion).

In the end, despite a defining feature of blockchain being the inability to later falsify records therein, Plaintiff has met his burden of showing that it is not legally certain that he is entitled to less than $75,000 in damages. Plaintiff alleges facts and provides evidence to support a good faith basis for $84,000 and change in damages from the Post-ICO Percentage. As this amount suffices for the jurisdictional minimum, the Court will not reach Movants' issue regarding the appropriate time period for valuing the Pre-ICO and Post-ICO Ether.

Movants also argue the Court lacks subject matter jurisdiction because Plaintiff's claims would require the Court to interfere in the internal workings or registration status of Loyakk U.S. or Loyakk U.K.  However, they do not cite any cases so finding.  The only claim that regards the Movants' alleged wrongdoing in dissolving Loyakk U.K. is the negligence claim.  Plaintiff states that as to his other claims, he pleads those facts only to support his alter ego allegations.  In any case, the Complaint does not seek reversal of Loyakk U.K.'s dissolution, but rather damages from the allegedly wrongful lack of notice. Movants accordingly have not met their burden on this argument.

In short, the motions to dismiss for lack of subject-matter jurisdiction are denied.

B.    *Personal Jurisdiction*

1.    *Standard of Review*

In a motion to dismiss for lack of personal jurisdiction, the "[p]laintiff bears the burden of establishing personal jurisdiction over the defendant."  *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998) (citation omitted).  For the plaintiff to defeat a Rule 12(b)(2) motion to dismiss, the plaintiff need only make a "prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant."  *Id.  See also Gas Sensing Tech. Corp. v. Ashton,* 795 F. App'x 1010, 1020 (10th Cir. 2020).

"The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. . . . If conflicting affidavits of the parties collide, the Court will resolve all factual disputes in the plaintiff's favor."  *Eleutian Tech., LLC v. Global Educ. Techs., LLC,* Civ. 07-181-J, 2009 WL 10672360, at *3 (D. Wyo. Jan.

22

23, 2009) (quoting *Behagen v. Amateur Basketball Ass'n of U.S.A.,* 744 F.2d 731, 733 (10th Cir. 1984)).

"The law of the forum state and constitutional due process limitations govern personal jurisdiction in federal court." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017). Wyoming's long-arm statute extends the jurisdictional reach of Wyoming courts as far as constitutionally permissible. Wyo. Stat. § 5-1-107. Therefore, the exercise of jurisdiction is permitted so long as it does not offend the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (citation omitted). Thus, for a court to have personal jurisdiction over a nonresident defendant, there must exist "'minimum contacts' between the defendant and the forum state." *OMI Holdings*, 149 F.3d at 1090 (citations omitted). To satisfy the minimum contacts standard, a court may assert either specific or general jurisdiction over the defendant. *Id.* at 1091.

In this case, Plaintiff asserts only specific jurisdiction. Specific jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation marks omitted). When a court has specific jurisdiction, it is

"confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.*

"Specific jurisdiction calls for a two-step inquiry: (a) whether the plaintiff has shown that the defendant has minimum contacts with the forum state; and, if so, (b) whether the defendant has presented a 'compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Old Republic*, 877 F.3d at 904 (citing *Burger King,* 471 U.S. at 476–77). "The minimum contacts test for specific jurisdiction encompasses two distinct requirements: (i) that the defendant must have purposefully directed its activities at residents of the forum state, and (ii) that the plaintiff's injuries must arise out of the defendant's forum-related activities." *Old Republic*, 877 F.3d at 904 (citation and quotation marks omitted).

The minimum contacts for specific jurisdiction "must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,* 141 S. Ct. 1017, 1025 (2021) (quoting *Walden v. Fiore,* 571 U.S. 277, 285 (2014)). "[A] strict causal relationship" is not required, but the suit must "arise out of or relate to the defendant's contacts with the forum." *Id.* at 1026.

"The purposeful direction requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, . . . or of the unilateral activity of another party or a third person." *Old Republic,* 877 F.3d at 904 (citations and quotation marks omitted). "Mere foreseeability of causing injury in another state is insufficient to establish purposeful direction." *Id.* (citation omitted). But "where

24

the defendant deliberately has engaged in significant activities within a State, ... he manifestly has availed himself of the privilege of conducting business there." *Id*. (citations and quotations omitted).

"Additionally, exercising personal jurisdiction over defendants must always be consonant with traditional notions of fair play and substantial justice." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.,* 514 F.3d 1063, 1071 (10th Cir. 2008). With these standards in mind, the Court first addresses whether it has personal jurisdiction over Loyakk U.S. and then turns to Ali.

  2. *Loyakk U.S.*

Plaintiff alleges that together with Loyakk U.K. (through Quasim), Loyakk U.S. (through Ali) initiated contact with him in Wyoming on or about April 7, 2018. The companies sought his consulting and advisory services that are the subject of the Agreement, and thus at the heart of this case. Plaintiff further alleges that Ali again reached out to him on or about April 13, 2018 regarding the same. Complaint ¶¶ 15-16. He attaches copies of the messages to the Complaint. Loyakk U.S. was aware through Ali – if not also through Quasim (who allegedly was at times also an officer or agent for Loyakk U.S.) – that Plaintiff resided in Wyoming. Plaintiff alleges Ali also communicated with him later in December 2018 when Plaintiff sought payment under the Agreement.

Ali states in his affidavit that neither he nor Loyakk U.S. have ever "committed an intentional action that was expressly aimed at Wyoming with knowledge that the brunt of an injury from such action would be felt in Wyoming." ECF 9-3 ¶ 11. But at this phase, when affidavits conflict, the Court must take the facts in Plaintiff's favor. Plaintiff alleges

Ali was the chief executive officer of Loyakk U.S.  He alleges Ali made these contacts in that role (and as an agent or alter ego of Loyakk *U.K.,* but that will be addressed below). There is no question that the contacts of a company's chief exectuvie officer in that capacity are attributed to the company.

As Plaintiff argues, phone calls and letters relating to the subject of the action and directed to the forum state can be sufficient contacts for jurisdiction.  *See, e.g., Rambo v. Am. S. Ins. Co.,* 839 F.2d 1415, 1418 (10th Cir. 1988).  "In proper circumstances, even a single letter or telephone call to the forum state may meet due process standards."  *Id.* (citing *Burger King,* 471 U.S. at 475 n.18).  "The proper focus for analyzing these contacts is whether they represent an effort by the defendant to 'purposefully avail[ ] itself of the privilege of conducting activities within the forum State.'"  *Id.* at 1419 (citing *Hanson v. Denckla,* 357 U.S. 235, 253 (1958)).  "Merely entering into a contract with a company located in the forum state is not enough on its own to subject a defendant company to jurisdiction in that state.  But creat[ing] continuing relationships and obligations with citizens of [the forum] state [will] subject a company to jurisdiction there."  *Gas Sensing Tech.,* 795 F. App'x at 1020 (internal citation and quotation marks omitted).

The contacts in which Plaintiff alleges Loyakk U.S. engaged are deliberate contacts with the forum state in which the company encouraged a consultant in Wyoming to provide services over the course of several months to its affiliate, Loyakk U.K.  Plaintiff's claims relate to these contacts.  The allegations reflect that Loyakk U.S. knew Plaintiff lived in Wyoming when it contacted him.  Exercising jurisdiction over Loyakk U.S. in these circumstances is consistent with fair play and substantial justice.  The Court has specific

jurisdiction over Loyakk U.S., and its motion to dismiss for lack of personal jurisdiction is denied.

### 3.    *Ali and Quasim*

Plaintiff alleges personal jurisdiction over Ali and Quasim first by pointing to the same communications Plaintiff identifies with respect to Loyakk U.S.  He further alleges that Ali and Quasim were his two main points of contact for Loyakk.  ECF 19 at 8 (citing Complaint ¶¶ 21, 23-26, 31).  Quasim signed the Agreement on behalf of Loyakk U.K.  ECF 1-2 at 45.  Plaintiff further argues that Ali and Quasim were alter egos of Loyakk U.K., and thus he contends the Wyoming contacts of that entity should also be treated as forum contacts of the two as individuals.  ECF 19 at 10.

### i.    *Fiduciary Shield Doctrine; No Imputed Contacts Doctrine*

Under the fiduciary shield doctrine in Wyoming law, contacts of a company's founders, officers, or other agents with a forum in their corporate capacity do not count for personal jurisdiction over the individual.  *See, e.g., Newsome v. Gallacher,* 722 F.3d 1257, 1277 (10th Cir. 2013) (citing *Ten Mile Indus. Park v. W. Plains Serv. Corp.,* 810 F.2d 1518, 1528 (10th Cir. 1987)).  There is an alter ego exception to this rule, which will be discussed separately below.[13]

Similarly, the "no-imputed contacts" doctrine of federal due process prevents attributing a company's forum contacts to its individual employees, officers or agents.

---

[13] The fiduciary shield doctrine also does not shield from personal jurisdiction an individual who, for instance, allegedly makes defamatory statements while in the forum state in their capacity for the company. *Rudolph v. Cunningham,* 13-cv-181-ABJ, 2015 WL 1507026, at *4 (D. Wyo. Mar. 31, 2015) (citing *Rusakiewicz v. Lowe,* 556 F.3d 1095 (10th Cir. 2009)).  But this exception is inapplicable here; Plaintiff does not bring intentional tort claims against Ali or Quasim.

*Newsome,* 722 F.3d at 1277; *Keeton v. Hustler Mag., Inc.,* 465 U.S. 770, 781, n.13 (1984) (citing *Calder v. Jones,* 465 U.S. 783, 790 (1984)).  *See also Wilshire Oil Co. of Tex. v. Riffe,* 409 F.2d 1277, 1281 n.8 (10th Cir. 1969).

Ali and Quasim undertook their communications with Plaintiff as officers, employees or agents of Loyakk U.S. or Loyakk U.K.  Although Plaintiff alleges Ali and Quasim aided and abetted Loyakk U.K.'s breach of contract, particularly by participation in its wrongful dissolution without notice to Plaintiff, this would harm any and all creditors of Loyakk U.K.  *I.e.,* Plaintiff's allegations do not support that the wrongful dissolution was specifically directed at Plaintiff.  These contacts therefore do not suffice for jurisdiction of Ali or Quasim.

### ii.    *Alter Ego or Piercing the Corporate Veil Doctrine*

This leaves Plaintiff's alter ego assertions.  Plaintiff asserts that Ali and Quasim are alter egos of Loyakk U.K. and therefore its contacts should be attributed to them.  In Wyoming law, alter ego liability requires a plaintiff to show

> that the corporation is not only influenced and governed by that person, but that there is such a unity of interest and ownership that the individuality, or separateness, of such person and corporation has ceased, and that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice.

*Energy Drilling, LLC v. Virtus Oil & Gas Corp.,* No. 16-CV-0040-F, 2016 WL 9450461, at *3 (D. Wyo. Apr. 15, 2016) (citing *Ten Mile,* 810 F.2d at 1526–27).

"For a corporation to be accorded treatment as a separate entity, it must exist and function as such and not be the alter ego of the person [or corporation] owning and

controlling it and cannot be used or ignored just to fit the convenience of the individual [or corporation]." *PanAmerican Mineral Serv., Inc. v. KLS Enviro Res., Inc.,* 916 P.2d 986, 990 (Wyo. 1996) (quoting *Amfac Mech. Supply Co. v. Federer,* 645 P.2d 73, 79 (Wyo. 1982); *overruled in part on other grounds, Texas W. Oil & Gas Corp. v. First Interstate Bank of Casper,* 743 P.2d 857, 859 (Wyo. 1987)).  Moreover, "if the corporation is not a viable one and the individuals are in fact conducting personal activities and using the corporate form as a shield, a court may feel compelled to pierce the corporate veil and permit assertion of personal jurisdiction over the individuals." *Ten Mile,* 810 F.2d at 1527 (applying Wyoming law and citing 4 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure, § 1069, p. 69 (1985 Supp.)).

*PanAmerican* identifies a lengthy list of "possible factors pertinent to the trial court's determination" of whether to pierce the corporate veil.  *Id.* (quoting *Federer*, 645 P.2d at 77-78).  Those factors include, for instance, "unauthorized diversion of corporate funds or assets to other than corporate uses; … the treatment by an individual of the assets of the corporation as his own; … the identification of the equitable owners thereof with the domination and control of the two entities; … the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors." *PanAmerican,* 916 P.2d at 990.  *See also Kaycee Land & Livestock v. Flahive,* 2002 WY 73, ¶ 4, 46 P.3d 323, 325 (Wyo. 2002) (quoting same list of potential factors).  Ultimately, "piercing the corporate veil is an equitable doctrine. … [W]hether the doctrine applies centers on whether there is an element of injustice, fundamental unfairness, or inequity." *Id.* at 326.

Conclusory allegations are insufficient to show personal jurisdiction by the alter ego

doctrine. *Ten Mile,* 810 F.2d at 1527. But "[t]he plaintiff need only make a prima facie

showing," *Id.* at 1524, including on his alter ego allegations.

> In … the absence of a full evidentiary hearing, a district court relying on
> documentary evidence in its consideration of a motion to dismiss may not weigh the
> factual evidence. Thus, the determination involves an application of the law to the
> facts as set forth in the affidavits and complaints, favoring the plaintiff where a
> conflict exists, as well as a determination as to the legal sufficiency of plaintiff's
> jurisdictional allegations in light of the facts presented.

*Id*.

In *Ten Mile*, the plaintiff did not show evidence tending to demonstrate the company

was the alter ego of its stockholders or its executive committee. *Id.* There were no

allegations or evidence that either group of individuals used the company for personal

affairs, nor apparently any allegations of their causing the company to divert funds, etc.

*See also Medina v. Four Winds Int'l Corp.,* 111 F. Supp. 2d 1164, 1169 (D. Wyo. 2000)

(finding on summary judgment that plaintiffs did not allege an "injustice or unfairness

would result unless corporate separateness is disregarded"); *Energy Drilling,* 2016 WL

9450461, at *4 (plaintiff "failed to plead any facts that [the individual] was acting as [the

company's] alter ego."); *Gas Sensing Tech. Corp. v. Ashton,* 2017 WL 2955353, at *11 n.6

(D. Wyo. June 12, 2017) (granting motion to dismiss for lack of personal jurisdiction

because alter ego allegations were conclusory).

On the other hand, in *PanAmerican*, the Wyoming Supreme Court found a prima

facie case that a corporate defendant (Dateline), its parent (KLS) and sister company

(DIMSA) were alter egos based on allegations that DIMSA used Dateline's equipment to

continue drilling in Mexico without paying the plaintiff under the plaintiff's contract with Dateline; an intercompany transfer of Dateline's stock to KLS, and KLS's pre-incorporation agreement that it would engage in drilling in Mexico through Dateline. 916 P.2d at 991. Thus, Dateline's forum contacts subjected all three entities to personal jurisdiction.

In addition, in *Yost v. Harpel Oil Co.,* 674 P.2d 712, 717-19 (Wyo. 1983), a shareholder's diversion of corporate assets for personal benefit and to creditors' detriment, and the commingling of funds among other things supported piercing the corporate veil. This Court has likewise denied motions to dismiss alter ego assertions when the allegations were not conclusory. *See, e.g., Virgin Ent. Ltd. v. Virginic LLC,* 19-cv-220-F, 2020 WL 13564059, at *6 (D. Wyo. Apr. 1, 2020) (denying Rule 12(b)(6) motion to dismiss alter ego liability); *Ziegler v. Dale,* 18-cv-71-SWS, 2018 WL 8131670, at *5 (D. Wyo. Dec. 7, 2018) (finding personal jurisdiction over two companies as alter egos that the individual defendant allegedly controlled and used in the scam that the plaintiff alleged).

Here, the corporate defendant Loyakk U.K. is not a viable company. Plaintiff alleges that Ali and Quasim allowed it to be dissolved to avoid its obligations to creditors, including Plaintiff. He alleges that Quasim and Ali did not distinguish Loyakk U.K. and Loyakk U.S. from their own personal interests, diverting Loyakk U.K.'s assets to themselves or other entities that they respectively owned. He further alleges that this worked a fraud on Plaintiff because despite Quasim and Ali promising him on behalf of Loyakk U.K. to pay him in the future, the company never did. Moreover, Loyakk U.S. is

31

not in good standing with its home state.  Defendants do not provide any evidence suggesting that Loyakk U.S. is a viable company.

Based on the allegations regarding Ali and Quasim's conduct in the dissolving of Loyakk U.K. and diversion of its assets to themselves or other entities they respectively control, Plaintiff has made a prima facie showing that Ali and Quasim are alter egos of Loyakk U.K.  Therefore, Loyakk U.K.'s contacts with Wyoming are ascribed to Ali and Quasim as individuals.  Those contacts are: Loyakk U.K. entered the Agreement, in which it contracted for Plaintiff to perform services over the course of months knowing that he lived and worked in Wyoming.  Loyakk U.K. also agreed therein to Wyoming as the forum for any disputes, and (through Ali and Quasim) it also directed communications to Plaintiff regarding the services at issue.  These contacts constitute purposeful direction of activity in the forum state, out of which Plaintiff's injuries arise.  Requiring Ali and Quasim as alter egos to defend this case also comports with fair play and substantial justice.  The Court thus concludes that it has personal jurisdiction over Ali and Quasim.

### C.    *Failure to State a Claim*

### 1.    *Standard of Review*

Rule 12(b)(6) motions for dismissal must take into account the notice pleading standard of Rule 8 (or Rule 9, if pleading special matters).  "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'  Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Erickson v. Pardus,* 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555

(2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.  This is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

The court "must accept as true all well-pleaded facts, as distinguished from conclusory allegations, and those facts must be viewed in the light most favorable to the non-moving party." *Moss v. Kopp,* 559 F.3d 1155, 1161 (10th Cir. 2009).  But "dismissal is appropriate where 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Al–Owhali v. Holder,* 687 F.3d 1236, 1240 (10th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Thus, mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice." *Khalik v. United Air Lines,* 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555).  But "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable and that a recovery is very remote and unlikely." *Twombly,* 550 U.S. at 556.

### 2.   *Aiding and Abetting Breach of Contract*

Count I alleges Loyakk U.S., Ali and Quasim either (1) are alter egos or agents of Loyakk U.K. and therefore stand in its shoes with respect to its breach of the Agreement,

or (2) aided and abetted Loyakk U.K.'s breach.  Movants do not appear to challenge the claim based on agency, as they do not articulate why the claim fails to plausibly allege that they acted as agents of Loyakk U.K. in the performance of its Agreement with Plaintiff. For the same reasons the Court found personal jurisdiction over Ali and Quasim as alter egos, Plaintiff also states a claim for alter ego liability against the three Movants for Loyakk U.K.'s breach of contract.

With respect to aiding and abetting the breach of contract, Movants argue that Wyoming courts have not recognized such a claim, and on this basis, the Court should dismiss it.[14]  Plaintiff does not cite any cases or statutes (from Wyoming or otherwise) recognizing such a claim, and the Court likewise has not found any support for such a claim in Wyoming law.

When the forum state's highest court has not yet directly addressed a substantive legal issue, under *Erie Railroad Co. v. Tompkins,* 304 U.S. 64 (1938), the Court must "endeavor to predict how that high court would rule." *Amparan v. Lake Powell Car Rental Cos.,* 882 F.3d 943, 947 (10th Cir. 2018).  "In doing so, we do not limit ourselves to the technical holdings of the cases.  Instead, both the holdings and considered dicta of the State Courts should be applied." *Colorado Visionary Acad. v. Medtronic, Inc.,* 397 F.3d 867, 871 (10th Cir. 2005) (internal quotation marks omitted).

> A federal court performing an *Erie* analysis may also consider appellate decisions in other states with similar legal principles and the general weight and trend of authority in the relevant area of law.  Finally, we are generally reticent to expand state law without clear guidance from the state's highest court for it is not a federal

---

[14] Movants also argue this claim cannot be pled in the alternative to the alter ego allegations, but they cite no authority in support.  Rule 8 expressly permits pleading inconsistent claims. Fed. R. Civ. P. 8(d)(3).

court's place to expand state law beyond the bounds set by the highest court of the
state.

*Amparan*, 882 F.3d at 947–48 (internal citations and quotation marks and other notations

omitted).

Movants note that when assessing potential aiding and abetting claims, Wyoming

courts fall back on the common law.

The Wyoming State Legislature has adopted the common law.  See Wyo. Stat. Ann.
§ 8-1-101. The common law is "the rule of decision in [the] state when not
inconsistent with the laws thereof," and "of full force until repealed by legislative
authority."

*Quest Holdco, LLC v. Scott Bushkie & Cornerstone Bus. Servs.,* No. 21-cv-0051-ABJ,

2021 U.S. Dist. LEXIS 255388, at *8 (D. Wyo. July 19, 2021) (quoting *Howard v. Aspen*

*Way Enterprises, Inc.,* 2017 WY 152, ¶ 17, 406 P.3d 1271, 1276 (Wyo. 2017)).  The salient

question thus is "not whether [the Wyoming Supreme Court has] 'adopt[ed]' the tort [in

question], but rather whether the tort has been repealed by statute or is otherwise

inconsistent with Wyoming law — that is, whether the tort is part of Wyoming's common

law." *Howard*, 406 P.3d at 1276.  In his response, Plaintiff argues that aiding and abetting

a breach of contract is neither repealed by statute nor inconsistent with Wyoming law.

In *Quest,* the Court noted that Wyoming currently recognizes "some aiding and

abetting claims." *Quest,* 2021 U.S. Dist. LEXIS 255388, at *9 (citing *Gas Sensing Tech.*

*Corp. v. New Horizon Ventures Pty Ltd as Tr. of Linklater Family Tr.,* 2020 WY 114, ¶ 18,

471 P.3d 294, 298 (Wyo. 2020); *Jontra Holdings Pty Ltd v. Gas Sensing Tech. Corp.,* 2021

WY 17, ¶ 18, 479 P.3d 1222, 1229 (Wyo. 2021) (same)).  In both of the cited cases, the

claim was for "aiding and abetting *wrongful* acts of others." *Id.* (emphasis added).

Civil claims for wrongful acts are by definition limited to torts. "Generally speaking, and without attempting an all-inclusive definition, a tort has a meaning similar to wrong and is an unlawful act injurious to another, *independent of contract*." *Howard*, 406 P.3d at 1276 (emphasis added, citing *Garner v. Hickman,* 709 P.2d 407, 413 (Wyo. 1985)). *See also United States v. Burke,* 504 U.S. 229, 234 (1992) ("A 'tort' has been defined broadly as a 'civil wrong, *other than breach of contract*, for which the court will provide a remedy in the form of an action for damages,'" emphasis added, quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on the Law of Torts 2 (1984)).

Moreover, as Movants note, aiding and abetting liability is defined in the Restatement (2d) of *Torts* and expressly requires "a *tortious* act in concert with the other or pursuant to a common design with him." Restatement (2d) of Torts § 876(a). In *Quest,* the claim was for aiding and abetting a tort: fraud. The Court accordingly found no reason to believe that the Wyoming Supreme Court would not recognize a claim for aiding and abetting fraud.

But here, Plaintiff attempts to bring a claim for aiding and abetting breach of contract. A breach of contract claim requires a breach – *i.e.,* an "unjustified failure to timely perform all or any part of what is promised" – but it does not require a *wrongful* breach. *See, e.g., Peterson v. Meritain Health, Inc.,* 508 P.3d 696, 705 (Wyo. 2022) (elements for breach of contract claim). An unjustified failure "is often stated … as failure without legal excuse to perform any promise which forms the whole or part of a contract."

36

*Reynolds v. Tice,* 595 P.2d 1318, 1323 (Wyo. 1979).  Meanwhile, the Restatement (2d) of Contracts does not define any aiding or abetting liability.

Because Plaintiff's claim for aiding and abetting breach of contract attempts to impose tort liability for conduct that is not tortious, the claim is inconsistent with Wyoming law.  *Cf., Legacy Measurement Sols., Inc. v. Chaput,* 15-CV-18-SWS, ECF 33 (Tr. Of Oral Ruling, March 26, 2015) at 9 (dismissing with prejudice a claim for aiding and abetting breach of contract for lack of support in Wyoming law).

At the very least, even if such a claim were consistent with Wyoming law, Plaintiff does not allege any tortious act by Loyakk U.K. in breaching the Agreement that the Movants aided or abetted.  Plaintiff points to the failure to pay him and impeding his ability to render the services that were the subject of the Agreement, but these are just failures to timely perform the contract.  Therefore, he fails to state a claim for aiding and abetting in this cause of action.

Count I is accordingly dismissed in part to the extent it alleges Loyakk U.S., Ali and Quasim aided and abetted Loyakk U.K.'s breach.  However, the alter ego and agency theories of liability for this claim remain pending against them.

3.    *Aiding and Abetting Breach of the Implied Covenant of Good Faith and Fair Dealing*

Count II alleges Loyakk U.S., Ali and Quasim either breached the implied covenant of good faith and fair dealing in the Agreement themselves as alter egos or agents of Loyakk U.K., or they aided and abetted Loyakk U.K.'s breach of that implied obligation. Complaint ¶¶ 58-60.  Thus, Plaintiff alleges a *contractual* duty of good faith and fair

dealing; he does not allege a breach of duty that would constitute an independent tort under Wyoming law, which requires a special relationship. *See, e.g., Cathcart v. State Farm Mut. Auto. Ins. Co.,* 123 P.3d 579, 589 (Wyo. 2005) ("special relationship created by the unequal bargaining power that an insurer has over an insured"); *Worley v. Wyo. Bottling Co., Inc.,* 1 P.3d 615, 624 (Wyo. 2000) (Wyoming's "limited tort claim for breach of the covenant of good faith and fair dealing in employment contracts" exists "only in rare and exceptional cases … where a special relationship of trust and reliance exists between the employer and the employee").

Accordingly, for the same reasons discussed as to Count I, Count II likewise fails to the extent it alleges aiding and abetting breach of the implied covenant of good faith and fair dealing.  It survives as to the alter ego and agency theories.

### 4.    *Unjust Enrichment and Quantum Meruit*

Counts III and IV respectively assert unjust enrichment and quantum meruit. Movants argue that these are equitable claims which can only move forward "[i]f a Plaintiff can present evidence of distinct, separate losses under an equity or tort theory sufficient to justify recovery beyond breach of contract," to the extent the recovery "is not duplicative or cumulative in nature."  ECF 17 at 18 (citing *Roussalis v. Apollo Elec. Co.*, 979 P.2d 493, 496 (Wyo. 1999)).  Movants note that Plaintiff seeks the same damages for these claims as on his contractual claims.  Plaintiff responds that *Roussalis* holds only that he cannot ultimately recover the same damages twice on the contract and equitable claims.  He argues that he should be permitted to prosecute these claims simultaneously until the finder of fact determines Defendants are liable on the breach of contract claims.  ECF 26 at 21.

In *Roussalis*, the parties had no written contract. Apollo Electric provided extensive electrical work to Roussalis and submitted several invoices for payment, which Roussalis did not pay. Apollo originally pled its claim as one in contract, and the district court granted summary judgment to it on some of the invoices. The other invoices required a trial, and just prior to trial, Apollo amended its claim to unjust enrichment. At trial, Apollo won on the remaining invoices. Roussalis argued on appeal that "causes of action for breach of contract and unjust enrichment are mutually exclusive." *Roussalis*, 979 P.2d at 496. The Wyoming Supreme Court rejected that argument, noting "[a] complaint may include alternative, independent claims as long as the factual allegations articulate the essential elements of the claims." *Id*. (footnote omitted). The same is true under Federal Rule of Civil Procedure 8. *Roussalis* then held as Movants note:

> *While Roussalis may be correct that a contract claim and a claim for unjust enrichment are mutually exclusive, that would be true only if they were being applied to the same set of facts.* Simply because a relationship between parties is defined at least in part by a contract, does not necessarily mean that the entire course of dealings between the parties must necessarily be determined by contract law. If a plaintiff can present evidence of distinct, separate losses under an equity or tort theory sufficient to justify recovery beyond breach of contract, then it should be entitled to make a recovery so long as it is not duplicative or cumulative in nature.

*Id*. (emphasis added). In *Roussalis*, the contract and unjust enrichment claims regarded different work. Here, Plaintiff alleges the same work for both claims.

As the Court noted in ruling on a Rule 12(c) motion for judgment on the pleadings:

> When a complaint alleges … the same facts for both a breach of unambiguous express contract and unjust enrichment, and the defendant does not dispute the existence of the express contract, there is no factual issue to await a factual record. In such circumstances, the Court can and should rule on the question on a Rule 12 motion.

*Flat Footed LLC v. Begley,* 19-CV-255-F, 2020 WL 10357004, at *4 (D. Wyo. Oct. 27, 2020) (citing *Parrish v. Arvest Bank,* 717 F. App'x 756, 765 (10th Cir. 2017) (affirming dismissal of unjust enrichment claim under Oklahoma law because plaintiff adequately alleged breach of contract); *Big-D Constr. Corp. v. Simplot Phosphates, LLC,* 16-cv-242-SWS, 2017 WL 3449608, at *3 (D. Wyo. Feb. 16, 2017).  This is because

> Wyoming law has recognized that the unjust enrichment remedy is not available where there is an express contract governing the relationship between the parties.... Thus, where the alleged unjust enrichment arises expressly from the terms of the contract, no unjust enrichment claim can stand because the party who receives what they were entitled to receive under the contract and performs their end of the bargain is not unjustly enriched.

*Flat Footed,* 2020 WL 10357004 at *3 (quoting *Big-D*, citing *Schlinger v. McGhee,* 268 P.3d 264, 272 (Wyo. 2012); *Sowerwine v. Keith,* 997 P.2d 1018, 1021 (Wyo. 2000)).

Here, unlike in *Flat Footed*, the Movants have not yet answered the complaint. Although their motions to dismiss attach a copy of the Agreement (*e.g.,* ECF 9-2), Movants dispute that they stand in the shoes of the contract party, Loyakk U.K.  In these circumstances, it is premature to dismiss the equitable claims.  The motions are therefore denied with respect to Counts III and IV.

   *5.   Negligence*

In Count V, Plaintiff alleges his contract with Loyakk U.K. and the involvement of Ali and Quasim therein as alter egos or as officers or agents of the entity, and then asserts "Defendants owed [Plaintiff] common law duties to exercise reasonable care in the management of their business affairs and performance of their obligations in connection with the [Agreement]."  Complaint ¶ 74.  He alleges Defendants breached those duties in

failing to notify him of the dissolution of Loyakk U.K. and failing to pay him during that dissolution (*id*. ¶ 75), and he is harmed because he continues to be unpaid. *Id.* ¶ 77.

Movants argue the negligence claim fails as duplicative of the breach of contract claim, is conclusory in its alter ego theory, does not allege a basis to impose aiding and abetting liability, and "cannot establish any other basis to hold [the Movants] personally liable for alleged wrongdoing by Loyakk [U.K.]." ECF 17-1 at 19. They do not, however, cite any legal authority in this section.

The Court has addressed Movants' arguments regarding alter ego and aiding and abetting above. As for this claim being duplicative of the contract claim, Movants cite only *Roussalis*. They do not articulate how that case supports dismissing this claim when Movants dispute that the contract applies to them as alter egos or agents. Though this argument is distantly related to the economic loss rule, the motions did not put Plaintiff on notice to brief that doctrine. Accordingly, the motions are denied with respect to Count V.

### D. *Movants' Cursory Arguments*

Movants briefly assert that iStrategies is a necessary party without whom this case cannot proceed. They do not, however, cite any authority in support. Their factual arguments appear to be that iStrategies is "in the only position to provide the crypto-token float," (ECF 8 at 25, ECF 9 at 16), and that it was the entity "allegedly responsible for providing the guaranteed float." ECF 17 at 20. Plaintiff responds that "iStrategies' limited license to resell a portion of Loyakk's tokens does not render them a necessary party" because it was Loyakk U.K. who promised him the Post-ICO Percentage, not iStrategies.

Movants' argument is too cursory to address on the merits. The motions regarding failure to join a necessary party are therefore denied.

Finally, Movants briefly argue for dismissal based on the equitable doctrine of laches. They assert that Plaintiff's delay in bringing this action results in the price of Ether having significantly increased in the meanwhile, etc. They do not, however, cite any legal support for dismissing claims on this basis at the Rule 12 phase. This issue is therefore likewise inadequately raised, and the motions asserting laches are denied.

*IV. Conclusion*

Consistent with the foregoing, the motions to dismiss (ECF 8, 9, and 17) are each GRANTED IN PART and DENIED IN PART. The Court has subject matter jurisdiction and personal jurisdiction of each Movant. Only the portions of Counts I and II that assert aiding and abetting are dismissed with prejudice. The Court does not give Plaintiff leave to amend because doing so would be futile under the Wyoming law discussed herein.

Dated this 12th day of January, 2023.

*Nancy D Freudenthal*

NANCY D. FREUDENTHAL
UNITED STATES SENIOR DISTRICT JUDGE